```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                  :
IN THE MATTER OF THE APPLICATION  :    AFFIDAVIT
OF THE UNITED STATES OF AMERICA   :
FOR A SEARCH WARRANT FOR THE      :
PREMISES KNOWN AND DESCRIBED AS   :    TO BE FILED UNDER SEAL
19605 COMO AVENUE, QUEENS, NEW    :
YORK (THE "PREMISES") AND LOCKED  :
AND CLOSED ITEMS CONTAINED        :
THEREIN.                          :
- - - - - - - - - - - - - - - - - x

STATE OF NEW YORK          )
COUNTY OF WESTCHESTER      : ss.:
SOUTHERN DISTRICT OF NEW YORK )
```

**M-11-228**

ALARIC PACHECO, a Special Agent with the United States Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states:

## INTRODUCTION

1. I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516, Title 18, United States Code. I have been employed by the Drug Enforcement Administration ("DEA") for approximately seven and a half years. During the course of my career, I have conducted numerous investigations of unlawful drug distribution in violation of state and federal narcotics laws, and have conducted or participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of

informants and reviews of taped conversations and drug records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are produced, transported, stored, and distributed and with the methods of payment for such drugs.

2. This affidavit is respectfully submitted, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, in support of the Government's application for a warrant to search the premises known and described as 19605 Como Avenue, Queens, New York, and any locked or closed containers therein (the "PREMISES").

3. This application is made in connection with an ongoing investigation into offenses involving the distribution of, and possession with intent to distribute, controlled substances and conspiracy to do the same, in violation of 21 U.S.C. §§ 841 and 846 (the "TARGET OFFENSES"). Based on the information contained herein, I respectfully submit that there is probable cause to believe that there are presently located within the PREMISES evidence of, and fruits and instrumentalities relating to, the TARGET OFFENSES, including narcotics and proceeds from narcotics trafficking, as set forth in ATTACHMENT A attached hereto.

4. The facts in this affidavit are based upon my personal knowledge, as well as conversations I have had with other law enforcement officers, witnesses, and other individuals involved in this investigation and my review of documentary and other evidence. Since this affidavit is made for the limited purpose of obtaining a

search warrant, I have not set forth each and every fact learned during the course of this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the search warrant sought herein. Unless otherwise indicated, where actions, conversations and statements of others are related herein, they are related in substance and in part.

## DESCRIPTION OF THE PREMISES

5. I have observed the premises. The PREMISES is a brick, two-story, detached house. The front door to the PREMISES is brown with translucent glass windows. To the right of the front door are the numbers "19605." The PREMISES is located in Queens, New York.

## PROBABLE CAUSE TO SEARCH THE PREMISES

6. Since at least in or about January 2011, the Sullivan County Sheriff's Department (the "Sheriff's Department") and the DEA have been investigating a house located on Gina Lane in Smallwood, New York (the "GINA LANE HOUSE"), where it was believed that multiple marijuana plants were being cultivated and harvested.

7. Based on my conversations with another DEA Special Agent ("Agent 1"), I have learned the following:

    a. According to a Detective with the Sullivan County Sheriff's Department ("Detective 1"), with whom Agent 1 has spoken, on or about January 6, 2011, Detective 1 saw a van

with no license plates parked in the driveway of the GINA LANE HOUSE. Upon noticing the van, Detective 1 pulled into the driveway of the ~~PREMISES~~ Gina Lane House and got out of his car to investigate. During the course of his investigation, Detective 1 saw a small vent coming out of one of the garage doors and condensation on the basement windows. Detective 1 also smelled a strong odor of marijuana near the garage doors.

    b. From on or about January 6, 2011 up to and including February 28, 2011, Agent 1 and other law enforcement officers from the Sheriff's Department conducted visual surveillance of the GINA LANE HOUSE. During the course of surveillance, other law enforcement officers observed activity at the GINA LANE HOUSE that was consistent with, based on my experience, training, and conversations with other law enforcement officers, a marijuana grow house. For example, each time law enforcement officers observed the GINA LANE HOUSE, the vertical blinds on the front windows have either been completely closed or partially closed. Based on his experience, training, and conversations with other law enforcement officers, Agent 1 knows that operators of grow houses often cover, board up, or otherwise obscure the grow house's windows to better conceal the illicit activities inside, as well as to remove the variable of sunlight from the treatment of the marijuana plants.

    c. According to Detective 1, on or about January 16, 2011, another Detective with the Sheriff's Department

("Detective 2") conducted surveillance in the vicinity of the GINA LANE HOUSE. At approximately 2:00 p.m., Detective 2 saw a Penske rental truck (the "rental truck") parked in the driveway of the GINA LANE HOUSE. Shortly after 2:00 p.m., Detective 2 followed the rental truck from the GINA LANE HOUSE to the vicinity of Monticello, New York, where a sergeant with the Sheriff's Department (the "Sergeant") performed a traffic stop of the rental truck. The driver of the rental truck consented to a search of the rental truck. According to Detective 1, during the search, the Sergeant and another Detective ("Detective 3") observed, among other things, materials that Agent 1, based on his experience, training, and conversations with other law enforcement officers, knows are used in grow houses. For example, the Sergeant and Detective 3 observed, among other things, approximately four empty boxes of fluorescent lights with ventilation systems, approximately one empty humidifier box, approximately five empty light ballast boxes.

    d.    According to Penske documents, the lease agreement for the rental truck was in the name "Lawrence Herz" at an address on Wythe Avenue in Brooklyn, New York (the "Wythe Avenue address").

    e.    According to records of Combined Energy Services, a company in Monticello, New York that sells, among other products, propane and carbon dioxide, from on or about November 26, 2010 through on or about January 11, 2011, the GINA

LANE HOUSE received approximately nine deliveries of carbon dioxide, each of which was paid for in cash. The customer on the account is a "Lawrence Herz" at the "Wythe Avenue" address. A "Michael Sztropkalyi" is listed as the tenant.

   f. According to records of T.W. Smith Corp., a company in Brooklyn, New York that sells, among other products, fire extinguishers, welding accessories, and carbon dioxide, on or about December 23, 2010, a "Lawrence Herz" at the Wythe Avenue address purchased two tanks of carbon dioxide for which he paid cash. Based on Agent 1's experience, training, and conversations with other law enforcement officers, Agent 1 knows that operators of grow houses use carbon dioxide to hasten the growth of the marijuana plants.

   g. Detective 1 and Agent 1 have had multiple contacts with New York State Electric and Gas ("NYSEG"), the company that provides electrical services to the GINA LANE HOUSE. Based on those contacts and his review of NYSEG records, Agent 1 learned the following:

    i. From on or about March 12, 2008 through on or about October 16, 2008, the name on the account for the GINA LANE HOUSE was "Lawrence Herz."

    ii. From on or about October 16, 2008 through on or about September 22, 2010, NYSEG did not provide any electricity to the GINA LANE HOUSE.

    iii. On or about September 22, 2010, a "Michael Sztropkalyi" requested that the electric meter at the GINA LANE HOUSE be turned back on.

  h. According to searches of commercial databases:

    i. The GINA LANE HOUSE is owned by "Ricky Herz," who is also associated with the address "74 Wythe Ave 76, Brooklyn, New York."

    ii. A "Lawrence Herz," with a date of birth of 1977, is listed as a "potential relative" of the "Ricky Herz" who owns the GINA LANE HOUSE.

    iii. "Lawrence Herz" is also associated with the address "74 Wythe Ave 76, Brooklyn, New York 11211" and "19605 Como Ave, Hollis, New York."

    iv. The phone number associated with the GINA LANE HOUSE – 845-796-0300 (the "GINA LANE PHONE") – is subscribed to in the name of "Michael Sztropkalyi."

  i. According to phone records for the GINA LANE PHONE:

    i. Since on or about November 6, 2010, the account has been in the name of "Michael Sztrokkatbi."

    ii. On or about January 2, 2011 there was a contact between the GINA LANE PHONE and a phone with call number 718-836-2402 (the "718 PHONE NUMBER"). According to phone records, the 718 PHONE NUMBER is subscribed to by Indoor Outdoor Gardener. Based upon an Internet search, Agent 1 learned that

Indoor Outdoor Gardener is a garden center in Brooklyn, New York specializing in hydroponics and hi-tech gardening supplies.

iii. From or about January 3, 2011 through on or about January 24, 2011, there were approximately 16 contacts between the GINA LANE PHONE and a cellular telephone with call number 347-277-8451 (the "HERZ CELLPHONE"). According to AT&T records, which Agent 1 reviewed, the HERZ CELLPHONE is subscribed to in the name "Lawrence Herz."

j. During a traffic stop on or about February 23, 2011, after initially lying about his identity, LAWRENCE C. HERZ informed Agent 1, in substance and in part, that his real name is LAWRENCE CRAIG HERZ and he lives on Como Avenue in Hollis, New York.

8. On or about February 24, 2011, the Honorable Lisa Margaret Smith, United States Magistrate Judge, Southern District of New York, authorized the issuance of a search warrant for GINA LANE HOUSE (the "search warrant"). On or about March 2, 2011, Agent 1 and other law enforcement officers executed the search warrant. Among other things, law enforcement officers found approximately 150 marijuana plants, as well as lights, a humidifier, pots, soil, and other materials used in marijuana grow houses. *However, no records or receipts regarding this grow operation were found in the Gina Lane House* Upon entering the GINA LANE HOUSE, other law enforcement officers were overwhelmed by the strong odor of marijuana.

9. On March 2, 2011, other law enforcement officers arrested MICHAEL J. SZTROPKALYI, the defendant, who was at the

*Therefore, in the ~~de~~ my view the fact that no documentary evidence was located at the Gina Lane House increases the likelihood that the records will be found at the Premises*

GINA LANE HOUSE at the time law enforcement officers executed the search warrant. According to Agent 1, SZTROPKALYI was advised of his Miranda rights, waived those rights, and agreed to speak with law enforcement. Based on my conversations with Agent 1, I have learned that SZTROPKALYI[1] stated the following, in substance and in part:

    a.    LAWRENCE C. HERZ approached SZTROPKALYI in or around September 2010 regarding operating a grow house.

    b.    HERZ provided the location - the GINA LANE HOUSE - for the grow house and financed the operation, although the utilities were put in SZTROPKALYI's name.

    c.    HERZ and SZTROPKALYI purchased the equipment for the grow house at a garden store in Brooklyn, New York.

    d.    Approximately 2 to 3 weeks ago, HERZ took approximately three lamps and fertilizer from the GINA LANE HOUSE and told SZTROPKALYI, in substance and in part, that he was starting a grow house, with 30-40 marijuana plants, in his bedroom closet within the PREMISES.

    e.    HERZ currently lives at the PREMISES.

    f.    HERZ owns a pistol grip shotgun.

---

[1] According to Agent 1, the information provided by SZTROPKALYI regarding the Gina Lane grow house is consistent with, and corroborative of, Agent 1's investigation. According to criminal history records, SZTROPKALYI has one felony conviction - a 2007 conviction for criminal possession of a narcotic drug in the 4th degree - and 14 misdemeanor convictions, including five misdemeanor drug convictions, two misdemeanor assault convictions, and convictions for petit larceny and resisting arrest.

11. Based on my training and experience, my personal participation in this and other investigations involving illegal drug activity, and conversations with other law enforcement officers who are knowledgeable of drug-trafficking investigations, I know that:

a. Individuals who traffic in illegal controlled substances often maintain books, records, receipts, notes, ledgers, money orders, money counters, bank records, currency, safe deposit box keys, telephone calling cards, address books, telephone numbers, pager numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled substances. Although quantities of narcotics sometimes move very quickly from one location to another as they are sold, records and documents and electronic devices frequently are maintained in these locations on a continuing basis and for long periods. It is also common practice for drug traffickers to utilize safes within their premises to safeguard and facilitate the concealment of the above described items;

b. Drug traffickers routinely conceal in their residences or the places used by drug traffickers to conduct their drug production and/or distribution activity large quantities of currency, financial instruments, and other items of value, which are typically the proceeds of illegal controlled substance transactions;

c. It is also common for drug traffickers to secrete contraband related to their drug trafficking activity,

such as scales and packaging materials, for preparing controlled substances for distribution, at their residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug production and/or distribution activity;

   d. Drug traffickers commonly maintain telephone number and address books, or papers which reflect names, addresses and/or telephone numbers for other associates of their illegal organization. Drug traffickers often utilize telephones, cellular telephones and pagers to maintain contact with other associates of their illegal businesses, and these telephone records, bills and pager numbers are often found in places used by drug traffickers to conduct their drug production and/or distribution activity;

   e. Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug production and/or distribution activity;

   f. Drug traffickers often own, possess and use weapons to facilitate their illegal drug trafficking activities. These weapons are most often secreted in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by

drug traffickers to conduct their drug production and/or distribution activity;

   g. Drug traffickers often use safe deposit boxes to amass, retain and conceal their illegal proceeds to avoid detection. Deposits to bank accounts create an accessible record of deposits, withdrawal and transfer of funds and banks are required to report cash transactions in excess of $10,000 to the Internal Revenue Service. Safe deposit boxes, which are readily accessible to drug traffickers, provide a "safe haven" for illegal drug proceeds where there is no such accounting.

REQUEST TO SEARCH THE PREMISES
AND ITEMS TO BE SEIZED

  12. Based on the foregoing, my involvement in this investigation, and my training and experience, it is my belief that there is probable cause to believe that the PREMISES has been and is continuing to be used to store instrumentalities, evidence, and fruits of violations of Title 21, United States Code, Sections 841 and 846, and 18 U.S.C. § 924(c) including, but not limited to, narcotics, firearms, and other items listed in ATTACHMENT A.

  13. The evidence, fruits and instrumentalities of the offenses including, but not limited to, the following:

   a. Any and all controlled substances, including, but not limited to, marijuana, substances and mixtures containing marijuana, traces of marijuana, as well as books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of

controlled substances, and items used to cultivate and maintain marijuana, including, but not limited to, lamps, humidifiers, ventilation systems, and cooling units;

      b. Papers, tickets, notes, schedules, receipts and other items relating to domestic and foreign travel;

      c. Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or the concealment of assets and the obtaining, secreting, transfer, concealment and/or the expenditure of money;

      d. Currency counting machines, telephone answering machines, electronic calendars and address/telephone devices, and related manuals used to generate, transfer, count, record and/or store the information, as well as the data contained therein;

      e. United States or foreign currency, negotiable instruments, stocks, bonds, jewelry, and precious metals and other valuables used to purchase controlled substances or equipment used to manufacture controlled substances, or which represent the proceeds of criminal activity;

      f. Photographs, including still photographs, negatives, videotapes, film, undeveloped film and the contents therein, slides, in particular photographs of co-conspirators, assets and/or controlled dangerous substances;

      g.    Address and/or telephone books, rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex number of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

      h.    Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including but not limited to scales and baggies;

      i.    Indicia of occupancy, residency, rental and/or ownership of the premises described herein, including but not limited to utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, and keys;

      j.    Firearms and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, and any records or receipts pertaining to firearms and ammunition;

      k.    Cellular telephones, as well as any information contained therein.

      14.    Based on my training, experience, participation in other investigations concerning narcotics trafficking, and discussions with other law enforcement agents, I know that individuals who traffic narcotics routinely secrete and store items of the sort described in ATTACHMENT A in secure locations like safety deposit boxes, suitcases, safes, key-lock strong boxes, and other types of locked or closed containers in an effort to prevent the discovery or theft of said items. This warrant

specifically includes a search of any closed containers or cabinets, locked or unlocked, found within the PREMISES.

## CONCLUSION

WHEREFORE, I respectfully request that a search warrant be issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure authorizing law enforcement agents assigned to DEA, with proper assistance from other law enforcement officers, to search the PREMISES, and authorizing the seizure of any item listed in ATTACHMENT A to this affidavit.

_____
ALARIC PACHECO
Special Agent
Drug Enforcement Administration

Sworn to before me this
2nd day of March, 2011

E

**ATTACHMENT A**

(1) Any and all controlled substances, including, but not limited to, marijuana, substances and mixtures containing marijuana, traces of marijuana, as well as books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances, and items used to cultivate and maintain marijuana, including, but not limited to, lamps, humidifiers, ventilation systems, and cooling units;

(2) Papers, tickets, notes, schedules, receipts and other items relating to domestic and foreign travel;

(3) Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or the concealment of assets and the obtaining, secreting, transfer, concealment and/or the expenditure of money;

(4) Currency counting machines, telephone answering machines, electronic calendars and address/telephone devices, and related manuals used to generate, transfer, count, record and/or store the information, as well as the data contained therein;

(5) United States or foreign currency, negotiable instruments, stocks, bonds, jewelry, and precious metals and other valuables used to purchase controlled substances or equipment used

to manufacture controlled substances, or which represent the proceeds of criminal activity;

(6) Photographs, including still photographs, negatives, videotapes, film, undeveloped film and the contents therein, slides, in particular photographs of co-conspirators, assets and/or controlled dangerous substances;

(7) Address and/or telephone books, rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex number of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

(8) Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including but not limited to scales and baggies;

(9) Indicia of occupancy, residency, rental and/or ownership of the premises described herein, including but not limited to utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, and keys;

(10) Firearms and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, and any records or receipts pertaining to firearms and ammunition;

(11) Cellular telephones, as well as any information contained therein.

This warrant specifically includes a search of any closed containers or cabinets, locked or unlocked, found within the PREMISES.